**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**FT. MYERS DIVISION**

**UNITED STATES OF AMERICA,**

      **Plaintiff**

**-vs-**                                                                                   **Case No. 2:06-cr-55-FtM-99DNF**

**CHARLES JONAS GREEN,**

      **Defendant.**

___

**REPORT AND RECOMMENDATION**

**TO THE UNITED STATES DISTRICT COURT**

This cause came on for consideration on the following motion filed herein:

> **MOTION:** **MOTION TO SUPPRESS INVOLUNTARY STATEMENTS (Doc. No. 38)**
>
> **FILED:** **August 18, 2006**
>
> ___
>
> **THEREON** it is **RECOMMENDED** that the motion be **DENIED**.

The Defendant, Charles Jonas Green is requesting that all of his statements made during an interview on March 13, 2006, at a Collier County Sheriff's Office be suppressed based upon the statements being made involuntarily. The Government contends that the statements made were made voluntarily. An evidentiary hearing was held on September 11, 2006.

**I. Testimony and Evidence**

The Government presented the testimony of Captain James Williams and Investigator Sotiere Nicholson from the Collier County Sheriff's Office. The Defendant testified on his own behalf.

### A. Captain Williams' Testimony

Captain James Williams is employed with the Collier County Sheriff's Office as the chief of investigations. (Tr[1]. p. 7). Captain Williams is responsible for the organized crime division, the criminal investigations division, the professional responsibility and training division, and the policy compliance bureau. (Tr. p. 7). In early 2006, Captain Williams became aware of a child exploitation investigation concerning the Defendant. (Tr. p. 8). On March 13, 2006, Captain Williams asked the Defendant's shift sergeant to bring the Defendant to the interview room which was located in a substation. (Tr. p. 9, 19). When the Defendant arrived in the interview room, Captain Williams greeted the Defendant and told him that the Sheriff's Office was conducting an investigation and there were some people from CID (the Criminal Investigation Division) there to talk to him. (Tr. p. 9-10, 16, 17, 20). Captain Williams told the Defendant that he could handle the interview any way he liked. (Tr. p. 10). Captain Williams asked the Defendant to remove his gun belt, which he did willingly. (Tr. p. 17). Captain Williams then left the interview room. (Tr. p. 10). He did not tell the Defendant that he was suspended from his job or that he would lose his job if he did not cooperate, and he never told the Defendant that the instant investigation was an administrative investigation. (Tr. p. 10, 17, 20-21, 23).

Captain Williams testified repeatedly that the decision whether or not the Defendant cooperated with the investigators and talked to them did not affect his job. (Tr. p. 10, 13-14, 17). He also testified that he trained the deputies to understand the difference between an administrative investigation and a criminal investigation. (Tr. p. 12). During an administrative investigation, Captain Williams testified that the investigators give a *Garrity* warning form, whereas at a criminal investigation the criminal

---

[1] "Tr." refers to the transcript (Doc. 56) of the hearing held on September 11, 2006.

investigators give a *Miranda* warning form. (Tr. p. 13-14, 22). At a criminal investigation, the individual is accorded the same rights as a private citizen. (Tr. p. 13-14). Captain Williams emphasized that a Sheriff's Office employee does not lose his job if he refuses to answer questions at a criminal investigation, but could lose his job if he refuses to answer questions during an administrative investigation. (Tr. p. 14, 15-16).

### B. Sotiere Nicholson's Testimony

Detective Sotiere Nicholson testified that he is an investigator detective in the special crimes bureau of the Collier County Sheriff's Office. (Tr. p. 24). Detective Nicholson testified that he has never worked in the Internal Affairs Department. (Tr. p. 25). On March 13, 2006, he met with the Defendant at the Goldengate Substation. (Tr. p. 25-26). He was working with Agent Diaz who works for the Florida Department of Law Enforcement ("FDLE"). (Tr. p. 26). The meeting with the Defendant, Agent Diaz and Detective Nicholson was recorded by video tape and a separate audio tape. (See, Exhibits 4 and 5[2]).

At the interview on March 13, 2006, Investigator Nicholson was introduced to the Defendant. (Tr. p. 27). He advised the Defendant of his *Miranda* warnings, and provided the Defendant with a Miranda Warning form. (Tr. p. 26). The Defendant read the form out loud, initialed each sentence, and signed the form. (Tr. p. 26). The Miranda Warning form contained the following language:

1. I have the right to remain silent.

2. Anything I say can and will be used against me in a court of law.

---

[2] The Exhibits are from the evidentiary hearing held on September 11, 2006.

3. I have the right to talk to a lawyer and have him present with me while I am being questioned.

4. If I can not afford to hire a lawyer, one will be appointed to represent me before any questioning.

5. If I decide to answer questions now without a lawyer present, I will still have the right to stop answering at anytime until I talk to a lawyer.

I understand each of these rights.

Having these rights in mind, I wish to talk to you now.

(Exhibit 6). The Miranda Warning form was signed by the Defendant and witnessed by Detective Nicholson. (Exhibit 6). After reading the form and signing it, the Defendant agreed to talk to the criminal investigators. (Tr. p. 26, 28). Detective Nicholson testified that the Defendant was advised that the interview was a criminal investigation. (Tr. p. 27).

Detective Nicholson explained that evidence was found of child pornography and the officers were attempting to find out further information about the evidence found. (Tr. p. 29-30). The Defendant never asked for an attorney and never requested to remain silent. (Tr. p. 30, 39, 46, 47). Detective Nicholson never told the Defendant he was from Internal Affairs. (Tr. p. 38). Detective Nicholson never told the Defendant he had to talk to him, threatened the Defendant, or told the Defendant he would lose his job if he did not cooperate. (Tr. p. 39). The Defendant did make admissions concerning the ownership of the child pornography. (Tr. p. 39). The Defendant knew that he was going to be arrested based upon his admissions, and asked for a change of clothes. (Tr. p. 47).

On cross-examination, Detective Nicholson admitted that he did not tell the Defendant at the outset of the interview that it was a criminal investigation. (Tr. p. 43, 45). He did state that as a

"courtesy" he was giving the Defendant his *Miranda* warnings. (Tr. p. 43). The questions concerning any criminal activity began after an hour of questioning. (Tr. p. 43).

### C. Defendant's Testimony

The Defendant testified that he was employed by the Collier County Sheriff's Office for twenty-seven (27) years. (Tr. p. 50). On March 13, 2006, he was called into a room for an investigation and was told nothing about why he was there until the tape recording began. (Tr. p. 52). Captain Williams told him that he was under suspension, and that he had to speak to investigators or else he would lose his job. (Tr. p. 53, 56, 57). Captain Williams also told the Defendant that investigators from CID were there to talk to him. (Tr. p. 55). He was never told that the investigation was a criminal investigation rather than an administrative investigation. (Tr. p. 54). He was told during the interview that he was being questioned concerning child pornography images found on a computer. (Tr. p. 60). The Defendant testified that he thought Detective Nicholson and Agent Diaz were from Internal Affairs because investigators from internal affairs are criminal investigators. (Tr. p. 55, 57). The Defendant never asked for an attorney because he thought that he was not allowed an attorney under *Garrity*. (Tr. p. 60).

The Defendant had received training for Internal Affairs investigations, had participated in Internal Affairs investigations, and was aware of *Garrity* issues. (Tr. p. 50-51). The Defendant testified that when he had gone through Internal Affairs investigations, he was given his *Miranda* warnings. (Tr. p. 51). In the past he always agreed to speak to the investigators because he had no choice. (Tr. p. 51). If he did not cooperate in the past, he knew he could be terminated. (Tr. p. 52). The Defendant believed that if he did not provide statements to the investigators at the March 13,


2006 interview, then he would be terminated from his job. (Tr. p. 53). The Defendant testified that if he knew that this investigation was a criminal investigation he would not have cooperated. (Tr. p. 54).

**II. Analysis**

The Defendant asserts that he believed he was in an administrative investigation and that he was compelled to answer the investigators' questions or lose his job, and therefore his statements should be suppressed. The Government asserts that the Defendant knew he was participating in a criminal investigation and voluntarily cooperated with the investigators.

A waiver of *Miranda* rights must "at a minimum be 'voluntary' to be effective against an accused." *Colorado v. Connelly*, 479 U.S. 157, 523 (1986), citing *Miranda v. Arizona*, 384 U.S. 436, 444, (1966). The inquiry into the validity of a waiver has two parts, first a court must look to whether the relinquishment of the right was voluntary and the product of a free and deliberate choice rather than intimidation, coercion, or deception, and second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. *Moran v. Burbine*, 475 U.S. 412, 421 (1986), *Coleman v. Singletary*, 30 F.3d 1420, 1426 (11th Cir. 1994), *cert. denied* 514 U.S. 1086 (1995). A court must consider the totality of the circumstances surrounding the interrogation to determine if the waiver was an uncoerced choice. *Id*. The Government has the burden to prove by a preponderance of the evidence that a defendant made a knowing, voluntary and intelligent waiver of his Miranda rights. *U.S. v. Chirinos*, 112 F.3d 1089, 1102 (11th Cir. 1997).

The Defendant raises the argument that he was coerced into giving statements to the investigators because he feared that he would lose his job if he did not cooperate. The Supreme Court

in *Garrity v. State of New Jersey*, 385 U.S. 493 (1967) addressed this issue. In *Garrity,* the defendants were police officers in New Jersey. *Id*. at 494. Irregularities were occurring at the police stations and the Attorney General was investigating these irregularities. *Id*. Each officer was warned that anything he said could be used against him in a criminal prosecution, and that the officer had the privilege to refuse to answer, but if he refused to answer he would be terminated. *Id*. The officers answered the questions from the investigators, and no immunity was given. *Id*. Some of the officers' answers were used against them in criminal prosecutions for conspiracy to obstruct the administration of traffic laws. *Id*. The officers were convicted. *Id*.

The Supreme Court found that coercion can be either physical or mental. *Id*. at 496. The issue is whether the accused "was deprived of his 'free choice to admit, to deny, or to refuse to answer.'" *Id*. at 496 (citation omitted). The Supreme Court determined that the officers had the choice to either forfeit their jobs or incriminate themselves. *Id*. at 497. "The option to lose their means of livelihood or to pay the penalty of self-incrimination is the antithesis of free choice to speak out or to remain silent." *Id*. The Supreme Court held that the statements by the officers were coerced and were not voluntary. *Id*. *Garrity* provides immunity to officers who in the course of an administrative investigation make statements, but these statements cannot be later used against these officers in a subsequent criminal proceeding. *United States v. Vangates*, 287 F.3d 1315, 1320 (11th Cir. 2002).

Before determining whether a police officer's testimony is coerced, the officer must show that he "subjectively believed that he would lose his job if he refused to answer questions and that his belief was objectively reasonable." *United States v. Waldon*, 363 F.3d 1103, 1112 (11th Cir. 2004), citing *United States v. Vangates*, 287 F.3d 1315, 1322 (11th Cir. 2002)). To show that a subjective belief is

objectively reasonable, the officer must show that his belief derived from the actions of the governmental entity. *Id*.

In the instant case, the Defendant asserts that he subjectively believed that he was participating in an administrative investigation and that he was required to cooperate and answer questions or else face losing his job. For the sake of argument, the Court will accept the Defendant's testimony that he subjectively believed he was compelled to respond to the investigators' questions or else face termination. The issue before the Court then becomes whether the Defendant's subjective belief was objectively reasonable.

The Defendant was a member of the Sheriff's Office for twenty-seven (27) years and participated in other internal affairs investigations. He had training regarding internal affairs investigations versus criminal investigations, and was familiar with both *Garrity* and *Miranda* warnings. The Defendant knew that Detective Nicholson and Agent Diaz were investigating child pornography, which based on his experience as a law enforcement officer, the Defendant would know is a crime. Further, after making incriminating statements, the Defendant asked for civilian clothes knowing that he would be arrested. Based upon his background, it is certainly questionable that it was objectively reasonable for him to have the subjective belief that he was participating in an administrative proceeding, and that he was would lose his job if he did not cooperate.

Captain Williams testified, which was verified by the audio tape of the meeting, that he told the Defendant he could handle the situation any way he wanted. Captain Williams testified that he did not tell the Defendant that he was required to cooperate or threaten him that if he did not cooperate, he would lose his job. Also, Detective Nicholson testified that he never told the Defendant that he would lose his job if he did not cooperate. No mention of *Garrity* was ever made. The Court determines that

the testimony of Captain Williams and Detective Nicholson was credible. The audio tape supports Captain Williams rendition of the facts. Even though the investigators may not have told the Defendant that the investigation was a criminal investigation, it is clear that they never told the Defendant that it was an administrative investigation or that *Garrity* applied.

Viewing all of the circumstances, it is clear to the Court that based upon his experience with the Sheriff's Office and the statements of Captain Williams and Detective Nicholson, the Defendant's subjective belief that he would lose his job if he did not cooperate was not objectively reasonable. Objectively, the Defendant should have known that he was not in an administrative investigation, and that he was in fact, in a criminal investigation. The Court determines that the Defendant had the choice whether to cooperate with the investigators and waive his Fifth Amendment rights to self-incrimination or remain silent. Further, the Defendant had a choice whether to waive the right to counsel. The Court respectfully recommends that the Motion to Suppress Involuntary Statements (Doc. 38) be denied.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Respectfully recommended in Chambers in Ft. Myers, Florida this  25th   day of September, 2006.

_____
DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

Copies:

All Parties of Record